DAVID J. CONVISER, Doing Business under the Firm Name and Style of UNEEDA CREDIT CLOTHING COMPANY, Respondent, *v.* J. C. BROWNSTONE & Co. and Others, Appellants, Impleaded. with JOHN CLARK, Defendant.

Second Department, May 9, 1924.

Unfair competition — injunction — action to restrain defendants from using list of plaintiff's customers purchased from one of plaintiff's employees and for accounting — list purchased consisted of best accounts — both parties were engaged in same business — corporation defendant and its president who controlled corporation defendant using list properly enjoined and assessed in damages — evidence shows conspiracy by all defendants — injunction not too broad in restraining defendants from soliciting business from any person whose name appears on list — damages — measure is profit that plaintiff would have made on sales actually made by defendants to plaintiff's customers.

The plaintiff, who is engaged in the retail clothing business, is entitled to an injunction restraining the defendants, who are engaged in the same business and in the same locality, from using a list of customers of the plaintiff, which list consisted of the best accounts that plaintiff had, and which was purchased from one of plaintiff's employees by an employee of the defendants who had previously worked for the plaintiff.

The evidence shows that the defendant corporation which controlled the corporation defendant that used the list entered into a conspiracy with the latter corporation and with the individual defendant who is president of both corporations, and also with its employee who had formerly worked for the plaintiff, to secure the list of the best accounts of the plaintiff by bribing one of plaintiff's employees, and, therefore, the restraining order was properly directed against all of the defendants and they were all properly assessed in damages.

The contention by the defendants that the injunction is too broad in that it restrains them permanently from circularizing or soliciting business from any person whose name appears on the list after having been compelled to surrender the list and all copies thereof is without merit, since they admit that they secured possession of the list through bribery and wrongdoing and, having brought upon themselves the necessity for granting the restraining order, they are not in a position to object to this provision which makes the order actually effective.

The trial court properly allowed as the measure of damages that plaintiff has suffered the profit that he would have made on the sales actually made by the defendants to plaintiff's customers.

APPEAL by the defendants, J. C. Brownstone & Co. and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 19th day of June, 1923, upon the decision of the court rendered after a trial at the Kings Special Term.

*Walter J. Rosston,* for the appellants.

*Benjamin Reass* [*Murry C. Becker* and *I. Henry Kutz* with him on the brief], for the respondent.

KELLY, P. J.:

Plaintiff brought this action to obtain an injunction restraining defendants from making use of a list of plaintiff's customers which, it was alleged, was dishonestly obtained from defendant Clark, one of plaintiff's clerks, and in the amended complaint plaintiff asked that defendants Brownstone & Company, Day Company and Brownstone individually be compelled to account for all sales made to plaintiff's customers by means of his records and that they be declared trustees *ex maleficio* for the benefit of plaintiff for all profits accruing to said defendants by reason of the wrongful use of plaintiff's property. During the course of the trial the complaint was amended so as to demand damages measured by the profits which would have come to plaintiff from the sales concededly made by defendants to plaintiff's customers, without reference to whether defendants profited from such sales, and this was the measure of damages applied by the learned trial justice. He found as matter of fact that the sales made by defendants to plaintiff's customers by reason of the unlawful use of plaintiff's list aggregated $3,798.69, and that plaintiff could have transacted this business in addition to its other business without increased expense. He found that plaintiff's profit on such business would have been fifty per cent, or one-half of the total sales, to wit, $1,899.34, and deducting two per cent for bad accounts he awarded plaintiff a judgment for $1,823.37 net damages in addition to injunctive relief.

The judgment in addition to enjoining the use of the stolen list of customers enjoins defendants permanently from in any manner or form " soliciting, circularizing or canvassing " any business from any of plaintiff's customers whose names appear on the list so wrongfully obtained and defendants are ordered to surrender the list to plaintiff.

Plaintiff for a number of years has conducted in Brooklyn the business of selling clothing to men and women on the installment plan under the name of the " Uneeda Credit Clothing Company," and as found by the trial court " has built up a wide and prosperous business." These concerns take the registry list of the board of elections and send out circulars to various localities. Some idea of the extent of the operations is found in the evidence of Vigadi, defendants' manager, who says: " I sent out 150,000 letters, 75,000 names, and a follow-up to each one."

The amount of business done by plaintiff in " wearing apparel " alone according to his witnesses was: 1917, $117,015.12; 1918, $175,908.48; 1919, $357,115.67; 1920, $415,872.81; 1921, $433,-866.92; 1922, $509,609.55.

The sending out of the plaintiff's circulars was in charge of a man named John Clark, one of the defendants, who does not answer, and defendant Ralph Vigadi. Prior to 1920 Mr. Vigadi had been with plaintiff for some three and one-half to four years, finally becoming assistant manager and sole credit manager.

The defendant W. A. Day Company was engaged in the same line of business. The defendant J. C. Brownstone Co. was interested as owner through stock control of a chain of such stores throughout the United States. Mr. J. C. Brownstone and the Brownstone Company controlled the Day Company and Mr. Brownstone was the president of both companies.

Up to 1920 the Day Company " had not yet invaded the Brooklyn field," but it is not surprising in view of the results above set forth that they deemed it a promising territory, and Mr. Wolf, the general manager of the Day Company, engaged Mr. Vigadi, the plaintiff's general manager, to leave plaintiff and to go into defendants' employ. Vigadi thought it would be a good thing for the Day Company to open up in Brooklyn, and in March, 1920, he left plaintiff's employ and went to the Day Company. For six months he traveled about, prepared the Day store for opening, prepared advertising, engaged help and finally opened the store on September 16, 1920.

It appears that plaintiff had a list of customers with their names and addresses on cards. They were divided into " paid up accounts," which contained the names of customers who paid their debts promptly, and " unpaid accounts," which were in liquidation, but of course the " paid up " customers were the cream. There were between 7,000 and 8,000 " paid up " accounts and 35,000 of the others. The names and addresses were kept in a card index. When Vigadi went over to defendant Day Company he conceived the idea of getting hold of plaintiff's " paid up " list, and he went after Clark, who had been his subordinate, and asked him to furnish him with a copy of plaintiff's list. They dickered over the price and finally Clark made out the list and gave it to Vigadi, receiving fifty dollars in cash. Clark says he did not think he was doing wrong, but he also testified that he " would give a hundred dollars now if I did not do it." Mr. Vigadi entered the fifty dollars on his daily sheet of disbursements as an expense, " mailing list $50." The learned trial judge said: " If this man [Vigadi] knew it as plaintiff's list, of course he had no business with it," and defendants'counsel said: " I agree with you."

I do not understand that appellants question the right of the plaintiff to an injunction restraining the use of the list obtained from plaintiff's unfaithful employee, but if they do, I think the

judgment was entirely right. It was a flagrant case of the modern methods pursued by some of our fellow-citizens whose desire for profit smothers all sense of right and decency.

The appellants say that the injunction is too broad and should be modified, and from my point of view this is the only question requiring any serious consideration.

In the first place the judgment enjoins the defendants from disclosing to any one the names or addresses of plaintiff's customers or from using in any form or manner any list of plaintiff's customers now or heretofore in their possession.

I do not understand that any serious objection is raised to this part of the injunction. Appellants say in their points: " As above intimated, defendants do not object to being restrained from disclosing to anybody any names or addresses of plaintiff's customers and from making any use of any list."

The *third* provision of the judgment directs the defendants to surrender up and deliver to plaintiff any and all list or lists of plaintiff's customers now or heretofore in their possession and all copies thereof and memoranda therefrom. As to this appellants say in their points: " Standing alone, this conclusion is unobjectionable, and defendants excepted only to so much of it as directed the surrender of the list to be made by defendants J. C. Brownstone and J. C. Brownstone & Co." This is because appellants claim that Brownstone and the Brownstone Company have not " been properly connected with the case."

The same argument is presented by appellants where they argue that the judgment for damages should not go against Brownstone and the Brownstone Company, although it is worth noting that appellants say: " At the outset we wish to make clear that we do not object to the fact that the injunction awarded runs also against these two defendants, although we do not think that any evidence adduced at the trial justified such a result." Vigadi was the manager of the Day Company which the Brownstone Company controlled and of which Brownstone was the president. Brownstone was also president of the Day Company.

At the opening of the trial defendants' counsel was apparently anxious to show that there was no question as to responsibility. Plaintiff's counsel said: " I read from the affidavit of Joseph C. Brownstone, interposed in this action, and verified in October, 1920. You do not dispute the ownership by the Day Company, and that Brownstone was president, do you? " to which defendants' counsel replied: " No, certainly not. Brownstone and J. C. Brownstone Company through stock ownership controlled the Day Company."

If they controlled the Day Company by stock ownership and by Brownstone as president of the Day Company as well as of the Brownstone Company, then they were responsible for Day's efforts to steal plaintiff's list. They, and I mean Brownstone and his companies, whether the Day Company or the Brownstone Company, reaped the profits coming from the theft of plaintiff's property. I think they were properly included in the injunctive provisions in the judgment and that they were also properly assessed in damages. I agree with the learned trial justice that the evidence justified his finding that there was a conspiracy to which they were all parties to start the Day Company in Brooklyn as a competitor of plaintiff by the use of the stolen list. Immediately on obtaining the list of plaintiff's paid up customers Vigadi addressed letters to them calling attention to his former connection with plaintiff's establishment, and soliciting their business for defendants.

Brownstone was the executive head of the entire outfit. It is stated that Mr. Brownstone was present at the trial. At any rate he did not take the stand or disavow responsibility for Mr. Vigadi's activities. The expenditure of the fifty dollars for the stolen property was entered in the daily expense sheet of the Day Company. The lease of the premises occupied by the Day Company was originally taken in the name of the Brownstone Company and was turned over to the Day Company. The learned trial justice found as matter of fact that the " defendants " confederated and conspired together to obtain plaintiff's lists. I think the evidence justified the findings and that plaintiff's lists, acquired by corrupting and bribing its employee Clark, were in the hands of Vigadi, the Day Company, Brownstone and the Brownstone Company. They were all competitors of plaintiff and came into the fertile field of Brooklyn attracted by plaintiff's rather remarkable increase in business. I think they were all properly included in the injunctive provisions and are properly made liable for the damages.

The remaining point is the second injunctive provision in the judgment: " Ordered, Adjudged and Decreed, that the defendants, their agents, servants and employees be and they hereby are permanently and forever enjoined and restrained from in any manner or form soliciting, circularizing or canvassing any business, custom or trade from any of plaintiff's customers whose names appear upon said list or lists now or heretofore in the possession of the defendants."

Appellants' grievance in this regard is that this provision is too broad. They concede that Vigadi's act in stealing plaintiff's list " *was iniquitous,*" but they say: " It is a significant fact that

although the list purchased by Vigadi contained over eight thousand (8,000) names of plaintiff's customers, the Court found that to only fifty-one (51) of such customers were sales made by defendant, which sales could have been made by plaintiff, but for defendants' acts, and that the total amount sold to such customers amounted to only $3,798.69. For the purpose of the present discussion we shall not challenge the correctness of this finding of fact but shall assume that the finding was justified by the evidence. What we do challenge, are the conclusions of law and the judgment entered herein providing for injunctive relief to the plaintiff.  *  *  *"
As above intimated, defendants do not object to being restrained from disclosing to anybody any names or addresses of ˙plaintiff's customers and from making any use of any list. They do, however, strenuously object to being permanently restrained from circularizing or soliciting business from any person whose name appears on a list of over eight thousand (8,000) names, after having been compelled to surrender up such list and all copies thereof. They say: " Such an order is absolutely impossible of performance, because no one can possibly carry in his head a list of over eight thousand (8,000) names and yet that is precisely what the defendants must do, if this judgment stands as entered."

Appellants say that they send out circulars to registered voters from names on the registry lists, and that it is quite likely that these registry lists may contain one or more of the names appearing on the stolen list, and if they should by chance and in good faith circularize any of these parties they would be liable to punishment for contempt. They say plaintiff had no vested right in the trade of its customers, they could trade where they saw fit, and that even in the case of the " paid up " customer the trade was " sporadic."

But I think the defendants are in no position to raise this question. They have by concededly " iniquitous " proceedings obtained plaintiff's lists which are more than a mere list of customers. The " paid up " list of 8,000 names is the result of plaintiff's dealings with these particular people. Clark testified that Vigadi wanted a list of " paid accounts." Defendants recognized the intrinsic value of the " paid up " list, and this peculiar value is testified to by plaintiff's witness Conviser. It was the result of eleven years' business experience. Defendants apparently concede the peculiar value of the paid up list in their fourth and fifth requests to find, which were found by the trial judge. Respondent says defendants could not have obtained these particular names from any public directory or catalogue or registration lists, and " It is well settled that although a man may solicit the patronage

of customers of one of his competitors, he may not do so by taking unfair advantage, such as fraudulently obtaining the use of a selected list of his competitor's customers. It is also well settled that an employee who aids in the obtaining of such a list for the benefit of a competitor commits a breach of confidence which equity will not permit to occur without a remedy. The wrong is sometimes considered as a breach of an implied provision in the contract of employment and sometimes as a breach of trust and confidence incident to a fiduciary relationship over which equity has jurisdiction."

In *Witkop & Holmes Co.* v. *Boyce* (64 Misc. Rep. 374, Erie County Special Term, BROWN, J., affd., without opinion, 131 App. Div. 922) the court said in a similar case: " The defendant's use of confidential communications, communicated to him by plaintiff for its benefit, for the purpose and with the intent to secure plaintiff's customers as the customers of plaintiff's rival and competitor, is so grossly unfair and unjust and the injury and damage inflicted upon plaintiff's property rights are so incapable of being ascertained, the conclusion is necessarily reached that plaintiff is entitled to the judgment and decree of this court permanently restraining the defendant from calling upon those customers named on the lists or cards furnished by the plaintiff and used by the defendant in October, 1908, for trade purposes. This conclusion is reached irrespective of the written contract of employment executed by the defendant, who is an infant; as plaintiff's right to equitable relief does not depend upon that instrument but solely depends upon the fact that the defendant has violated and claims the right to continue to violate existing property rights of the plaintiff."

And in *Witkop & Holmes Co.* v. *Great A. & P. Tea Co.* (69 Misc. Rep. 90, Erie Special Term, POUND, J.) the court said in deciding an equity action for injunction: " The defendant tea company undoubtedly has the right to solicit the trade of plaintiff's customers and to obtain a list thereof by using opportunities for observation open to all. Plaintiff had no vested property rights in the trade of such customers. The vice of defendants' position is that it obtained the lists, or copies thereof, by hiring the drivers and made the lists of value to itself by sending the drivers to transfer, if possible, the trade from their former employer to their new employer. In other words, although the end might be lawful, the means adopted were unlawful. This is a case, not of malicious interference with contracts where equity refuses to interfere unless the services are of a unique and special character, but of unfair competition. *McCall Co.* v. *Wright* [198 N. Y. 143]. The conduct of defendants

amounts to an unlawful obtaining and use of a trade list (Penal Law, § 553, subds. 6, 7), a carrying to a business rival the benefit of business secrets acquired while in the employ of plaintiff, and as such should be enjoined."

The respondent also calls attention to the fact that the learned trial justice saw the litigants and that the form of the injunction is primarily in the discretion of the trial court. Respondent cites Nims on Unfair Competition and Trade-Marks (2d ed. §§ 367, 368): " In formulating a final injunction in trade-mark and unfair competition cases, the object of the court is to stop confusion, to eliminate the unfair dealing. Its primary purpose is to protect not the defendant's business but that of the plaintiff. * * * A court should consider all the defendant's acts together in forming its opinion of his purposes and their results to the plaintiff, and their relation to his rights. The court should not be nice in limiting the scope of the relief granted, because some of the imitations, if practiced singly and without fraudulent intent, might not constitute unfair competition."

The respondent's argument is that defendants by their *quasi* criminal conduct have forfeited their right to deal with these customers whose names appear on the stolen lists, and this appears to be the law as interpreted by the New Jersey Court of Errors and Appeals in *Stone* v. *Grasselli Chemical Co.* (65 N. J. Eq. 756) where Judge SWAYZE writing for a unanimous court uses language peculiarly applicable to the case at bar, where he says: " Every doubt must be resolved against the parties to a fraudulent act. If the defendant thereby suffers, it suffers only by reason of having been a party to Goss' fraudulent disclosure of the secret." The same doctrine is laid down by the Circuit Court of Appeals in *Herold* v. *Herold China & Pottery Co.* (257 Fed. Rep. 911, 913).

This court has granted an injunction in the same form restraining defendants who had seduced a collector in a wet wash establishment from soliciting any of the plaintiff's customers who had been served through the employee who went back on his former employers. (*People's Coat, Apron & Towel Supply Co.* v. *Light*, 171 App. Div. 671; affd., without opinion, 224 N. Y. 727.) A litigant by his own iniquitous conduct may practically deprive himself of what otherwise he might rightfully claim.

The defendants have brought all this on themselves. I think it is best to let the injunction stand in its present form. If defendants in circularizing the community at large inadvertently chance on some of the plaintiff's paid up customers and are brought to bar on a charge of contempt, let them explain that they acted in good faith. If they *did*, no court will punish them. To remove

the prohibition from them would be to practically deprive the plaintiff of the benefit of the judgment.

The only other point demanding consideration is as to the award of damages. The trial justice took the amount of sales which plaintiff was able to prove, made by defendants to plaintiff's customers, $3,798.69, and allowed plaintiff the profit which he (plaintiff) would have made from the sales. This appears to be the true rule of damages. (*Westcott Chuck Co.* v. *Oneida N. Chuck Co.*, 199 N. Y. 247, CULLEN, Ch. J.) It is not what profit, if any, the wrongdoer made — it is the profit the lawful owner would have made if his property had not been stolen. The rights of the owner are not limited by the rogue's manipulation of the stolen property. (See, also, *Walter Baker & Co.* v. *Slack*, 130 Fed. Rep. 514, 519 [C. C. A.].) In my opinion the learned judge at Special Term properly disposed of this branch of the case.

If the defendants are in trouble over the injunction it is trouble which they have brought on themselves by attempted sharp practice and dishonesty, and by conduct which they concede was iniquitous.

The judgment should be affirmed, with costs.

Present — KELLY, P. J., RICH, MANNING, KELBY and KAPPER, JJ.

Judgment unanimously affirmed, with costs.